UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.  ) | Docket No. 2:25-cr-00003-NT |
| ) | |
| SHAWN SMALL, ) | |
| ) | |
| Defendant. ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

Defendant Shawn Small is charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). Before me is the Defendant's motion to suppress all evidence seized by police officers following Small's arrest and a search of his pack. Def.'s Mot. to Suppress (ECF No. 37). I held a hearing on the Defendant's motion on August 28, 2025 (ECF No. 56). For the reasons set forth below, I **DENY** the Defendant's motion to suppress.

**FACTUAL FINDINGS**

Officer Shawn Anastasoff, a 25-year veteran of the Scarborough Police Department, cultivated a relationship with an unhoused individual with the initials S.T.,[1] who lived in an encampment in Scarborough, Maine. Over the last couple of years, Officer Anastasoff would go to S.T. for information, and S.T. proved helpful to Officer Anastasoff on multiple occasions by providing information on street-level crime. S.T. receives no compensation for the information he provides, and he was

---

[1] S.T. was named at the suppression hearing but I refer to him by his initials because using his actual name could be detrimental to him.

facing no criminal charges so he was not expecting some type of benefit from Officer Anastasoff on that front.

On September 12, 2024, Officer Anastasoff went to S.T.'s encampment to show him photographs of suspects in a couple of recent thefts in the area. One photograph depicted an individual on a scooter who was suspected of stealing a firearm from a vehicle in the Target parking lot. S.T. indicated that he would call Officer Anastasoff if he saw any of the individuals depicted in the photographs.

Shortly before 11:00 a.m. on September 28, 2024, S.T. called the Scarborough Police Department communications center to report that there was an individual at his encampment with a firearm, whom S.T. believed was one of the photographed suspects that Officer Anastasoff had shown him on September 12, 2024. Dispatch alerted Officer Anastasoff, and he and two other officers, Officer Benjamin Pulvino and Officer Corey Rogers, went to meet S.T. behind the Cumberland Farms store diagonally across from S.T.'s encampment. They arrived around 11:10 a.m. and S.T. told the police officers that a white male in his 20s named Shawn Small was trying to sell a firearm at the encampment. S.T. stated that the firearm was loaded. He indicated that Small was wearing a white sweatshirt and was carrying the loaded firearm in a black over-the-shoulder sling pack. S.T. then showed the police officers a video he had taken of Small at the encampment just before S.T. left to meet the officers. In the video, Small was wearing a white sweatshirt, jeans, and over-the-ear

2

headphones. S.T. also showed the officers a picture of the Smith and Wesson M&P firearm that Small was trying to sell.[2]

While still at the Cumberland Farms, Officer Anastasoff (or one of the officers accompanying him) searched the Bureau of Motor Vehicle records for "Shawn Small" and found two individuals with that name. The police officers showed photographs of both Shawn Smalls to S.T., and he picked out the individual who was at his encampment. Officer Anastasoff was also able to ascertain that the identified Shawn Small had been convicted of a felony and that he was then on probation or bail conditions with the State of Maine.

S.T. indicated that he wanted to get back to his encampment and did not want the police officers to enter the encampment because he was concerned that Small would realize that he had provided the officers with information. They decided to have S.T. go back to the encampment with the intention of sending Small away so that the police could then approach Small after he exited the encampment.

S.T. returned to the encampment, but Small had already left. After waiting a few minutes but not seeing Small exit, the police officers went into the encampment. There they spoke with S.T.'s girlfriend who told the officers that Small was heading to Wal-Mart because he had several cell phones that he planned to sell at Wal-Mart's kiosk.

---

[2]   The police officers photographed S.T.'s phone showing the picture of the firearm, which was admitted into evidence as Government Exhibit 2, but they did not obtain a copy of the video that was on S.T.'s phone.

Officer Pulvino drove to the nearby Wal-Mart to try and locate Small. From his vehicle in the parking lot, he could see into the front vestibule of Wal-Mart where the kiosk was located. At the kiosk, he saw a male with a white sweatshirt and dark pants with over-the-ear headphones who looked like the individual in S.T.'s video. Officers Anastasoff, Pulvino, and Rogers gathered in the parking lot and waited about ten minutes for Small to exit Wal-Mart because they thought it would be safer to approach Small outside the store. But Small went further into Wal-Mart, so Officer Anastasoff went into the store around 12:19 p.m. to see if he could find Small.

Officer Anastasoff intended to review Wal-Mart's video surveillance to see if he could locate Small within the store, but the loss prevention officer he usually worked with was not on duty and the store manager was unable to operate the surveillance camera system. The store manager offered to walk through the store to see if he could find Small. While Officer Anastasoff was waiting for the store manager at the front of the store, he noticed Small in the swimsuit section. He noted that Small had the black sling-style pack over his shoulder and saw that it looked weighted. Officer Anastasoff, who was in full uniform, made eye contact with Small, and Officer Anastasoff had the impression that Small was going to try to hide or walk off. Officer Anastasoff decided to approach Small. Officer Anastasoff was concerned about public safety because he suspected that Small had the handgun in the shoulder sling pack. Given the security risks associated with detaining Small in a large retail store, Officer Anastasoff did not initially tell Small that he was looking for a gun because he was worried Small might reach for it. Officer Anastasoff told Small that he was

4

investigating a theft and asked for Small's identification. Small was cooperative and cordial, and he provided Officer Anastasoff his identification card, which confirmed that he was Shawn Small.

When Officer Anastasoff saw Officer Rogers approaching, he told Small that Small was going to be detained in handcuffs and grabbed one of Small's arms as he took out handcuffs. Small immediately pulled his arm and body away. As soon as he did that, within seconds, Officer Rogers and Officer Anastasoff took Small to the ground. Officer Anastasoff pulled off Small's sling pack and slid it across the floor because he wanted to separate Small from any firearm. Small, who was now facedown on the floor, then put his hands under his body toward his waist and interlaced his fingers beneath him. Officer Anastasoff became concerned that Small had the firearm in his pants and was reaching for it. Small was kicking and flailing around with his hands down by his waist, and he was refusing to comply with commands to stop resisting.

At this point, Officer Pulvino joined the scrum, and the three officers were able to get Small into handcuffs. Once Small was in handcuffs, Officer Anastasoff checked the sling pack, which was about six or seven feet from where Small was taken down. Inside the pack, the officers found the handgun they had seen in the picture taken by S.T. *See* Gov't Ex. 2. Small was placed under arrest at about 12:22 p.m.

## DISCUSSION

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend IV. In *Terry v. Ohio*, the Supreme Court held that "a police officer may

5

in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." 392 U.S. 1, 22 (1968). In order to make an investigatory *Terry* stop, an officer must have "a reasonable suspicion that criminal activity may be afoot." *United States v. Rabbia*, 699 F.3d 85, 89 (1st Cir. 2012). The basis for the suspicion must be particularized and objective and "rooted firmly in specific and articulable facts." *United States v. Brake*, 666 F.3d 800, 804 (1st Cir. 2011) (internal quotation marks omitted).

Determining whether the police acted appropriately conducting a *Terry* stop involves a "two-step appraisal." *United States v. Rasberry*, 882 F.3d 241, 247 (1st Cir. 2018) (quoting *United States v. Pontoo*, 666 F.3d 20, 26 (1st Cir. 2011)). "To begin, the stop must be justified at its inception. Then, as the stop proceeds, the officers' actions must be reasonably related in scope to the circumstances which justified the interference." *Id.* at 247 (internal citations and quotation marks omitted).

The Defendant contends that the police lacked a reasonable articulable suspicion to conduct a *Terry* stop. Reply to Government's Resp. in Opp'n to Def.'s Mot. to Suppress ("**Reply**") 2–5 (ECF No. 51). The Defendant also asserts that the police exceeded the allowable scope of a *Terry* stop and subjected him to a "de facto" arrest without probable cause when Officer Anastasoff grabbed his arm. Def.'s Mot. to Suppress 4–7; Reply 5–8.

The Defendant's first argument is easily dispatched. The Defendant contends that the police lacked a reasonable articulable suspicion because S.T. was not a

6

reliable source. The Defendant attempts to disparage S.T.'s reliability by pointing out that he was an unhoused individual who was trying to curry favor with the police officers so they would not force him to vacate his encampment. I see no reason why S.T. would think that providing false information would win favor with the Scarborough police. Further, I credit Officer Anastasoff's testimony that S.T. had provided reliable information in the past. This was not an anonymous tip. The police had sought out this information from a known citizen who had provided good information in the past. And by the time the police officers approached Small in Wal-Mart, the police had significantly more than just S.T.'s statement. S.T. came, as they say, "with receipts." He had a video showing Small in his encampment and a picture of the gun that Small was trying to sell. S.T.'s girlfriend confirmed that Small had been at the encampment, and she told police that Small would be headed to the Wal-Mart kiosk. And the information from S.T. and his girlfriend was corroborated when the police found Small a short time later at the kiosk in Wal-Mart doing exactly what S.T.'s girlfriend had said he would be doing. Further, at Wal-Mart, Small appeared as he had looked in the video taken by S.T. just an hour earlier. He was wearing a white sweatshirt and dark pants, and he was carrying the bag just as S.T. had described. When Small provided Officer Anastasoff his identification, Small further confirmed that he was the individual—an individual prohibited from possessing firearms by a prior felony conviction—that the officers were looking for. On these facts, the police officers had well beyond a reasonable articulable suspicion to believe that criminal activity was afoot.

The Defendant's second argument fares no better. The Defendant contends that the officers exceeded the bounds of a lawful *Terry* stop and executed a de facto arrest when they handcuffed Small. In *Rabbia*, the First Circuit explained:

> Whether a *Terry* stop has escalated into a de facto arrest depends on a number of factors, including, *inter alia*, the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect, and the information conveyed to the suspect. Above all, an inquiring court must bear in mind that it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.

*Rabbia*, 699 F.3d at 91 (internal citations and quotation marks omitted). Although the use of handcuffs "substantially aggravates the intrusiveness of a putative *Terry* stop," *United States v. Acosta-Colon*, 157 F.3d 9, 18 (1st Cir. 1998) (internal quotation marks omitted), the First Circuit has made clear that:

> the use of handcuffs in the course of an investigatory stop does not automatically convert the encounter into a de facto arrest. Rather police officers engaged in an otherwise lawful stop must be permitted to take measures—including the use of handcuffs—they believe reasonably necessary to protect themselves from harm, or to safeguard the security of others.

*United States v. Meadows*, 571 F.3d 131, 141 (1st Cir. 2009) (internal citations and quotation marks omitted). "Security precautions, such as the use of handcuffs, must be based on the officers' 'reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.'" *Rasberry*, 882 F.3d at 247–48 (quoting *Acosta-Colon*, 157 F.3d at 19).

Here, the police officers located Small in a large retail store with other people around. Officer Anastasoff knew that Small was a convicted felon, and he had a sound

8

basis to believe he was carrying a loaded firearm. Officer Anastasoff was justifiably concerned that Small might reach for the firearm, and he deliberately did not mention that he was investigating a theft *of a firearm* when he initially approached Small alone. When he saw that Officer Rogers was nearby, Officer Anastasoff told Small that he needed to put him in handcuffs while he questioned him, and Officer Anastasoff grabbed Small's arm. The Government has pointed to specific facts and circumstances that support Officer Anastasoff's belief that handcuffs were necessary in these circumstances to carry out the legitimate purpose of the stop without exposing the police and the public to an undue risk of harm. The decision to handcuff Small during *Terry* questioning was reasonable.

Once Officer Anastasoff grabbed Small's arm, the entire tenor of the encounter changed. As Small resisted the restraints, the police officers gained more reason to suspect that Small was armed. They also grew more concerned for their own safety as he refused to submit to handcuffing and reached toward his waist. At this point, the officers had probable cause to arrest Small, if not for possession of a firearm by a prohibited person, then certainly for resisting arrest or detention under 17-A M.R.S. § 751-B(1)(B), which is a Class D misdemeanor.[3] *See United States v. Langston*, No. 2:21-cr-00166-GZS, 2022 WL 2340862, at *9 n.13 (D. Me. June 29, 2022). Once they had probable cause to arrest Small, the police had a right to look into the sling pack

---

[3]  Under this provision of Maine law, "[a] person is guilty of refusing to submit to arrest or detention if, with the intent to hinder, delay or prevent a law enforcement officer from effecting the arrest or detention of that person, the person . . . uses physical force against the law enforcement officer." 17-A M.R.S. § 751-B(1)(B). Law enforcement officers are authorized to arrest for any Class D crime committed in the presence of the officer. 17-A M.R.S. § 15(1)(B).

as a search incident to arrest. *United States v. Perez,* 89 F.4th 247 (1st Cir. 2023), *reh'g and reh'g en banc denied*, 113 F.4th 137 (1st Cir. 2024), *cert. denied*, (145 S. Ct. 1469 (2025) (search of backpack the defendant was carrying which the police removed during handcuffing was lawful under the Fourth Amendment as a search incident to arrest even though arrestee was in handcuffs and unable to reach the pack); *United States v. Eatherton*, 519 F.2d 603, 609 (1st Cir. 1975) (search of briefcase that the defendant dropped to the ground when he was arrested was reasonable under the search-incident-to-arrest doctrine).

Because I find that the *Terry* stop did not exceed lawful boundaries and that the search of Small's over-the-shoulder sling pack was appropriate as a search incident to a valid arrest, there is no need to go further and address the Government's alternate theory that the search was authorized by state conditions of probation.[4]

## CONCLUSION

For the reasons stated above, I **DENY the** Defendant's motion to suppress.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 24th day of September, 2025.

---

[4] The Defendant also argued that the police should have had a warrant to search an additional pack that Small had left at the Wal-Mart customer service desk. There is no indication that there was anything of any evidentiary value in that pack, so I do not address that argument either.